T.C. Memo. 2012-194

UNITED STATES TAX COURT

SCOTT M. ERIKSEN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  30768-09, 4527-10,          Filed July 12, 2012.
           4900-10, 4902-10.

<u>Richard Carl Eriksen</u>, <u>Fred A. Foley</u>, and Michelle Aaron (specially

recognized), for petitioners.

<u>Alicia A. Mazurek</u> and <u>Alexandra E. Nicholaides</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Tina E. Aginaga, a.k.a. Tina E. Aginaga-Dove, docket No. 4527-10; Mitchell L. Hardin and Stephanie A. Hardin, docket No. 4900-10; and Jeffrey L. Kesselring and Arleen L. Kesselring, docket No. 4902-10.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  After the three-year period of limitations on assessment under section 6501(a) had expired, respondent issued to petitioners notices of deficiency determining deficiencies in, and section 6662(a) accuracy-related penalties with respect to, their 1999, 2000, 2001, and/or 2002 Federal income tax.[2]  Petitioners are sheriff's deputies (deputies) or employees with the Oakland County Sheriff's Department (OCSD) who argue that the assessments were time barred by the three-year period of limitations in section 6501(a).  Relying on Allen v. Commissioner, 128 T.C. 37 (2007), respondent counters that the limitations period remains open under section 6501(c) because petitioners' return preparers prepared each return at issue falsely or fraudulently with intent to evade tax.

The threshold issue for decision is whether respondent has clearly and convincingly proven that any of petitioners' returns was false or fraudulent.  We hold that respondent has not met his burden with respect to petitioners Scott M. Eriksen, Mitchell L. Hardin and Stephanie A. Hardin, or Jeffrey L. Kesselring and Arlene L. Kesselring, and that assessment against these petitioners is time barred.

---

[2]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

We hold that respondent has met his burden with respect to petitioner Tina E. Aginaga, a.k.a. Tina Aginaga-Dove (Deputy Aginaga), and that the period of limitations on her 1999 through 2002 returns remains open. Given that holding, Deputy Aginaga concedes respondent's deficiency determinations with respect to her 1999 through 2002 Federal income taxes in the respective amounts of $495, $675, $803, and $825. We also decide whether Deputy Aginaga is liable for accuracy-related penalties under section 6662(a) and (b)(1) for 1999 through 2002 on account of negligence or disregard of rules or regulations. We hold she is.

## FINDINGS OF FACT

### I. Preliminaries

Some facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Each petitioner or couple resided in Michigan when he, she, or they petitioned the Court.

### II. Petitioners

Petitioners worked for OCSD in Michigan at all relevant times. Scott M. Eriksen (Deputy Eriksen), Deputy Aginaga, Mitchell L. Hardin (Deputy Hardin), and Jeffrey L. Kesselring (Deputy Kesselring) (collectively deputy petitioners) worked as deputies in the corrective services division of OCSD, administering care

and custody to inmates in the Oakland County (county) main jail or one of its satellite jails. Stephanie L. Hardin (Ms. Hardin) was employed as a clerk or cashier, and Arleen L. Kesselring (Ms. Kesselring) worked as a technician. We refer to Deputy Hardin and Ms. Hardin as the Hardins as they were married during the years at issue. We refer to Deputy Kesselring and Ms. Kesselring as the Kesselrings for the same reason.

III.    Tax Return Preparers and Preparation of Returns

A.    Mr. Kern

James Kern graduated from the Detroit College of Business in 1965 with a bachelor of science degree and a major in accounting and tax. He eventually became an enrolled agent with the Internal Revenue Service (IRS), and he represented clients before the IRS. He sometimes held himself out to clients and to staff as a former IRS employee though he was not.

Mr. Kern began preparing tax returns in college, and he continued to do so throughout much of his career. He operated a sole proprietorship accounting firm from the late 1970s until sometime in 1998, when he partnered with his then girlfriend to form Kern Weyn Associates, Inc. (KWA). Mr. Kern specialized, to an extent, in preparing tax returns for law enforcement personnel. His clientele included, but was not limited to, employees of OCSD, the Michigan State Police,

the Wayne County Sheriff's Office, and the Detroit Police Department. Mr. Kern

prepared upwards of 3,000 tax returns in or around 2001, including between 300

and 400 returns for law enforcement employees. Many law enforcement clients

were personal friends with whom Mr. Kern associated socially.

As a result of knowledge Mr. Kern acquired from preparing officers' tax

returns, he devised a generic questionnaire that he used to prepare returns for law

enforcement clients. The questionnaire referenced deductions allegedly available to

law enforcement personnel, including expenses for ammunition, equipment, boots,

and mileage driven to and from court or the gun range.[3] While the set of questions

made Mr. Kern's practice efficient, it lent itself to inaccuracies with its one-size-fits-

all approach. In particular, the questionnaire targeted cash outlays but failed to

determine the deductibility of those items for Federal income tax purposes. For

---

[3]OCSD deputies, including deputy petitioners, attended the shooting range at least once per month for qualification purposes. They also used their personal vehicles to guard prisoners off site or to attend training exercises, and they could request reimbursement from the county for related mileage expenses. Deputy petitioners rarely (if ever) used their personal vehicles to attend court, though each Federal income tax return at issue reported that they did. Petitioners established at trial that the expense category "mileage to court" also included mileage to guard prisoners off site and mileage to and from the gun range.

example, the survey did not question whether expenses incurred were ordinary, necessary, or otherwise reimbursable by OCSD or the county.[4]

Mr. Kern often claimed deductions for clients, including deputy petitioners, without receipts or supporting documentation. At least in part, he determined his client's entitlement to deductions on the basis of the completed questionnaire and sometimes through a question and answer session. He often estimated expenses, using receipts, information returns, and copies of canceled checks to establish the amounts and deductibility of certain items only when that information was provided to him. He relied on the employee's Form W-2, Wage and Tax Statement, for information on employer-reimbursed expenses, but he never questioned clients about employers' reimbursement policies. Nor did he investigate the same on his own.

Mr. Kern had minimal (if any) contact with many of his clients during the years at issue. He made light of unethical conduct to his partners and staff, stating on one occasion that claiming deductions for items that did not appear to be deductible was "not wrong until you get caught". He met with each petitioner or couple once during the years at issue, and he was unable at trial to recall preparing

---

[4]There was in effect a countywide policy during the years at issue whereby petitioners could seek reimbursement for qualifying job-related expenses.

any return at issue. Nor did Mr. Kern adopt a fixed fee schedule; his clients set the price for Mr. Kern's services and paid him what they thought his services were worth.

### B. Mr. Redinger

Curt Redinger earned a college degree in math and business from Michigan Technological Institute in 1990. He became a certified public accountant in the mid-1990s and was a member in good standing during the years at issue. After working at small and mid-sized accounting firms for the better part of 12 years, Mr. Redinger desired to go into business for himself, and he engaged a business broker to perform due diligence and find a suitable practice to acquire.

Mr. Redinger purchased KWA, including its client list, in November 2001.[5] Having been trained as a corporate return preparer, Mr. Redinger was unfamiliar with preparing individual tax returns. To guide Mr. Redinger in the preparation of such returns, Mr. Kern stayed on with KWA as a contract employee for two years. During the 2002 filing season Mr. Kern prepared most (but not all) individual income tax returns for the 2001 taxable year.

For the most part, Mr. Redinger adopted Mr. Kern's practice of eliciting information from his clients and reporting that information on tax returns without

---

[5]We refer to KWA and Mr. Redinger's successor firm collectively as KWA.

substantiation. Mr. Redinger gathered information to prepare his clients' tax returns from answers given in response to questionnaires. Mr. Redinger often (but not always) estimated his client's current year deductions using amounts the individual claimed on his or her prior year's tax return. He did not meet with his clients every year; and when he did, he did not seek substantiation of claimed deductions, merely confirming with his clients that their expenses were "the same as it has been" or "about the same" as last year.

To facilitate the return preparation process, Mr. Kern supplied Mr. Redinger with a list of deductions that Mr. Kern believed taxpayers were entitled to claim according to their occupation (i.e., police officers received one set of deductions; firemen another). Among the expenses targeted for law enforcement officers were side-arm purchases, ammunition, cell phones, uniform cleaning, court-related travel, and on-the-job meals. Mr. Redinger used the outline as a starting point for preparing clients' returns, and he generally adjusted each taxpayer's return according to that taxpayer's situation. Mr. Redinger did not investigate the reimbursement policies of OCSD or the county on his own.

C.    Preparation of Nonparty Witnesses' Returns

Mr. Kern, and on occasion Mr. Redinger, instructed his staff to use prior year's itemized deductions when preparing law enforcement clients' current year's

tax returns.[6] Employees were also directed to allocate police officers a charitable contribution deduction equal to 1.5% of their gross (total) income. This amount was not based on actual donations but was determined from industry standards of amounts individuals donated to charities. We note that petitioners' ratios of charitable contribution deductions to total income reported for each year at issue do not equal 1.5%.[7]

During the years at issue Michael Summers (Deputy Summers) and Timitre Kyriakides (Deputy Kyriakides) worked at OCSD and had their personal income tax returns prepared by Mr. Kern or Mr. Redinger. Among the returns prepared were the 1999 through 2002 personal income tax returns for Deputy Summers and the 2001 through 2003 personal income tax returns for Deputy Kyriakides. Deputy Summers, during an in-person meeting with Mr. Kern, felt encouraged to claim a deduction for a gun he did not purchase. He later stopped using KWA as a return preparer because he was opposed to claiming a deduction for a fictitious firearm.

[6]Petitioners' returns do not report identical deductions year to year; nor are we able to discern any statistical significance from the deductions claimed across multiple years.

[7]The ratio of charitable contributions to total income, rounded to the nearest one-tenth of 1% percent ranges for Deputy Eriksen for 1999 through 2002 from 2.9% to 3.6%; for Deputy Aginaga for 1999 through 2002 from 2.5% to 3.9%; and for the Hardins for 2000 through 2002 from 2.6% to 4.0%. The Kesselrings' ratios for 2001 and 2002 were 1.7% and 6.9%, respectively.

Deputy Kyriakides' 2001 through 2003 returns claimed itemized deductions for weapons, ammunition, a cell phone, and protective equipment for which he did not provide receipts or substantiation. Respondent made an offer of proof at trial of the testimony of approximately 150 fact witnesses who would have testified to experiences with Messrs. Kern and/or Redinger similar to those testified to by Deputies Summers and Kyriakides.

IV.     Criminal Prosecution of Messrs. Kern and Redinger

Respondent's Criminal Investigation Division (CID) investigated KWA. Special agents with CID executed a search warrant at KWA's office and seized all individual tax returns attaching Schedules A, Itemized Deductions. Thereafter, the U.S. Attorney's Office for the Eastern District of Michigan filed separate criminal informations with the U.S. District Court for the Eastern District of Michigan charging Messrs. Kern and Redinger each with one count of willfully aiding and assisting in the preparation and presentation to the IRS of a false individual Federal income tax return.

Subsequently, Messrs. Kern and Redinger each pleaded guilty to one count of aiding and assisting in the preparation of a false Federal income tax return in violation of section 7206(2). In the agreed factual basis for guilty plea, Mr. Kern admitted to preparing a false 2002 Federal income tax return for Robert C. Turner

and Kelly A. Turner by inflating itemized deductions (charitable contributions) and business expenses (unreimbursed employee expenses).  Mr. Kern also admitted, for sentencing purposes, to preparing 51 Federal income tax returns claiming improper deductions and causing a total tax loss to the United States, exclusive of penalties and interest, of $115,869.  Petitioners' returns were not included among the 51 returns considered as part of Mr. Kern's guilty plea.

In the stipulated factual basis for guilty plea, Mr. Redinger admitted to willfully assisting in the preparation of a false 2001 Federal income tax return for Derek Meyers and Sarah Meyers, one of whom was an OCSD deputy, by claiming false unreimbursed employee expenses as itemized deductions.  For sentencing purposes, Mr. Redinger admitted to preparing 34 Federal income tax returns on which he claimed improper deductions for clients and causing a total tax loss to the United States of $58,728, not including penalties and interest.  Petitioners' returns were again not included among the 34 returns considered as part of Mr. Redinger's guilty plea.  The record is not clear as to whether there is overlap between the false and fraudulent returns admitted to by Messrs. Kern and Redinger.

During his plea allocution Mr. Kern stated that not all returns he prepared were fraudulent.  Upon further questioning from the District Court on that point,

Mr. Kern represented that of the 1,900 or so tax returns that he prepared annually, between 30 and 40 were false. He also maintained that the IRS was, in some instances, challenging legitimate deductions.

As part of his criminal plea agreement, Mr. Redinger agreed to disclose to the IRS false and fraudulent Federal tax returns that he and Mr. Kern prepared. In furtherance thereof, on November 25, 2008, Mr. Redinger submitted to a revenue agent in respondent's civil division a partial list of clients for whom he and Mr. Kern prepared false tax returns for 1999, 2000, and/or 2001. Petitioners were not included in that summary, and the record is not clear as to whether Mr. Kern or Mr. Redinger provided a more comprehensive list to CID at another time. Nor is the record clear as to whether Mr. Kern agreed to cooperate with the IRS or whether he participated in preparing Mr. Redinger's list.

After conclusion of the criminal cases against Messrs. Kern and Redinger, CID referred more than 200 Federal income tax returns to the IRS civil division for examination, including the returns at issue here. The IRS audited between 130 and 150 individual returns, including those of each petitioner or couple. Some individuals whose returns were referred to the civil division amended their tax returns to remove falsely claimed deductions. Petitioners did not.

V.     Federal Income Tax Returns and Determination of Deficiencies

   A.     Overview

Petitioners hired Mr. Kern or Mr. Redinger to prepare their Federal income tax returns for each year at issue.  Generally, each petitioner or couple met with Mr. Kern or Mr. Redinger once in the first year the return preparer was retained.  In subsequent years each petitioner or couple simply dropped off at KWA's office information considered necessary by that taxpayer to prepare his, her, or their tax returns.  Each return claimed deductions for unreimbursed employee expenses and charitable contributions.  Respondent disallowed most of these deductions, and the parties stipulate that petitioners have not substantiated any of the claimed deductions.[8]

Respondent reflected his determinations in notices of deficiency separately issued to each petitioner or couple outside the period of limitations on assessment in section 6501(a).  In particular, respondent determined the following deficiencies and section 6662(a) accuracy-related penalties:

_____

[8]As discussed more fully below, respondent allowed Deputy Aginaga, the Hardins, and the Kesselrings each a $250 charitable contribution deduction for each year at issue.  The record is not clear why respondent allowed those deductions given the parties' stipulation that the donations were not substantiated.

Scott M. Eriksen  (Docket No. 30768-09)

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|-----------|
| 1999 | $266 | $53 |
| 2000 | 812 | 162 |
| 2001 | 1,086 | 217 |
| 2002 | 1,066 | 213 |

Tina E. Aginaga a.k.a. Tina E. Aginaga-Dove  (Docket No. 4527-10)

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|-----------|
| 1999 | $495 | $99 |
| 2000 | 675 | 135 |
| 2001 | 803 | 161 |
| 2002 | 825 | 165 |

Mitchell L. Hardin and Stephanie A. Hardin  (Docket No. 4900-10)

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|-----------|
| 2000 | $262 | $52 |
| 2001 | 705 | 141 |
| 2002 | 892 | 178 |

Jeffrey L. Kesselring and Arleen L. Kesselring  (Docket No. 4902-10)

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|-----------|
| 2001 | $321 | $64 |
| 2002 | 443 | 89 |

We summarize respondent's proposed adjustments for each petitioner or couple in turn.

B.    Deputy Eriksen

Mr. Kern prepared, and Deputy Eriksen filed, Federal income tax returns for 1999 through 2002.  Respondent selected each return for examination.  Deputy Eriksen claimed for 1999, and respondent disallowed, an unreimbursed employee expense deduction of $3,056, a charitable contribution deduction of $1,025, and a deduction for tax preparation fees of $100.[9]  Deputy Eriksen also claimed the following itemized deductions, among others:

| Item | 2000 | 2001 | 2002 |
|------|------|------|------|
| Weapon and ammunition | $1,128 | $1,126 | $1,046 |
| Uniforms and cleaning | 636 | -0- | -0- |
| Protective equipment | 941 | -0- | -0- |
| Uniforms and protective clothing | -0- | 1,894 | 1,910 |
| Cell phone and pager | 983 | 883 | 947 |
| Boots and shoes | 197 | -0- | -0- |
| Union and/or professional dues | 372 | 472 | 414 |
| Mileage | 694 | 944 | 882 |
| Professional subscriptions | -0- | 180 | 210 |
| Charitable contributions | 1,185 | 1,575 | 1,785 |
| Tax preparation fees | 100 | 125 | 125 |

_____

[9]The record includes a copy of Deputy Eriksen's 1999 Federal income tax return and supporting Schedule A.  The Schedule A references an attachment that is not in the record.

Respondent disallowed each of the foregoing itemized deductions and allowed in lieu thereof the standard deduction for each year.

C.    Deputy Aginaga

Mr. Kern prepared, and Deputy Aginaga filed, Federal income tax returns for 1999 through 2002.  Those returns claimed, in addition to others, the following itemized deductions:

| Item | 1999 | 2000 | 2001 | 2002 |
|------|------|------|------|------|
| Weapon and ammunition | $984 | $1,025 | $1,124 | $1,016 |
| Uniforms and cleaning | 614 | 575 | -0- | -0- |
| Protective equipment | -0- | 612 | -0- | -0- |
| Uniforms and protective clothing | -0- | -0- | 1,866 | 1,712 |
| Cell phone and pager | -0- | 965 | 1,017 | 1,194 |
| Boots and shoes | 314 | 214 | -0- | -0- |
| Union and/or professional dues | 660 | 371 | 487 | 492 |
| Mileage | 458 | 471 | -0- | -0- |
| Education | 230 | -0- | -0- | -0- |
| Professional subscriptions | -0- | -0- | 210 | 195 |
| Charitable contributions | 985 | 1,295 | 1,725 | 2,085 |

On audit of these returns, respondent disallowed each of the foregoing itemized deductions, except that respondent allowed a charitable contribution deduction of $250 for each of the years 1999 through 2002.

D.     The Hardins

Mr. Kern prepared, and the Hardins filed, Federal income tax returns for 2000 through 2002.  Those returns claimed as itemized deductions, in addition to other items, the following deductions:

| Item | 2000 | 2001 | 2002 |
|------|------|------|------|
| Weapon and ammunition | $1,744      $1,226 | $1,365 | |
| Uniforms and cleaning | 1,261 | -0- | 1,123 |
| Protective equipment | 592 | -0- | 300 |
| Uniforms and protective clothing | -0- | 1,028 | -0- |
| Cell phone and pager | 1,018 | 1,085 | 1,245 |
| Boots and shoes | 465 | -0- | 150 |
| Union and professional dues | 371 | 474 | 474 |
| Mileage | 1,137 | 316 | 765 |
| Professional subscriptions | -0- | 180 | 250 |
| Charitable contributions | 1,125 | 1,385 | 1,915 |
| Tax preparation fees | 250 | 125 | -0- |

On audit of the Hardins' 2000 through 2002 returns, respondent disallowed each of the foregoing itemized deductions, except that he allowed unreimbursed employee expenses of $474 for each of the years 2001 and 2002 and charitable contribution deductions of $250 for each of the years 2000 through 2002.[10]

---

[10]Respondent disallowed the Hardins' claimed itemized deductions for 2000 and allowed in lieu thereof the standard deduction for that year.

E.    The Kesselrings

The Kesselrings filed Federal income tax returns for 2001 and 2002.  Mr. Kern prepared the Kesselrings' 2001 return, and Mr. Redinger reviewed and signed their 2002 return, though he did not prepare it.  Each of those returns was selected for audit.  The Kesselrings claimed, in addition to other deductions, the following itemized deductions on their 2001 and 2002 Federal income tax returns:

| Item | 2001 | 2002 |
|------|------|------|
| Weapon and ammunition | $985 | $1,025 |
| Uniforms, boots, and  maintenance | 515 | 510 |
| Cell phone and pager | 365 | 365 |
| Union and professional dues | 414 | 414 |
| Mileage | 961 | 975 |
| Charitable contributions | 965 | 945 |

Respondent disallowed each of the foregoing deductions, except that he allowed the Kesselrings deductions for unreimbursed employee expenses of $414 for each of the years 2001 and 2002, and a $250 charitable contribution deduction for each of those years.  Finally, the Kesselrings claimed a deduction for real estate taxes of $7,039 for 2001, of which respondent disallowed $1,942.

VI.    Petitions, Trial, and Petitioners' Oral Motion for Summary Judgment

Petitioners petitioned the Court in response to the notices of deficiency, and a trial was held in Detroit, Michigan.  Petitioners moved for summary adjudication

after the presentation of evidence closed, and the Court took that motion under advisement. We will deny petitioners' motion because, as we find, the outcome of these cases turns on whether respondent has proven fraud and not on any legal issue in controversy. See Rule 121(a).

OPINION

I.      Statute of Limitations

We begin with an overview of the limitations period for assessment of income tax. The Commissioner generally must assess any income tax within the three-year period after a taxpayer files his or her return. Sec. 6501(a). The statute of limitations in section 6501(a) may be tolled, however, in the case of a false or fraudulent return with the intent to evade tax. Sec. 6501(c)(1). Tax determined to be due on a false or fraudulent return may be assessed, or a proceeding in court for collection of the tax may be begun, at any time. Id. In Allen v. Commissioner, 128 T.C. at 42, we held that section 6501(c) indefinitely extends the period of limitations on assessment in the case of a false or fraudulent return, even though it is the preparer and not the taxpayer who intended to evade tax. As we recognized in Colestock v. Commissioner, 102 T.C. 380, 385 (1994): "[W]here fraud is alleged and proven, respondent is free to determine a deficiency with respect to all items for the particular taxable year without regard to the period of limitations."

Respondent asserts in his pretrial memorandum of law that the instant cases are identical to <u>Allen</u> and that the period of limitations is open.[11] There are certainly similarities between <u>Allen</u> and the instant cases, but the two are fundamentally at odds. Like the return preparer in <u>Allen</u>, Messrs. Kern and Redinger were convicted of violating section 7206(2). Similar to the returns at issue in <u>Allen</u>, petitioners' returns were not identified in the criminal case against Mr. Kern or Mr. Redinger. As in <u>Allen</u>, each notice of deficiency in these cases was issued after expiration of the three-year period of limitations in section 6501(a). Both <u>Allen</u> and the instant cases concern claimed itemized deductions. The parallels between <u>Allen</u> and the instant cases mostly end there.

Unlike these cases, <u>Allen</u> was submitted to the Court for decision without trial under Rule 122. <u>Id.</u> at 37. Among the stipulated facts agreed to by the <u>Allen</u> parties was that Mr. Allen's returns were false and fraudulent and that the return preparer falsified the returns with intent to evade tax. <u>Id.</u> at 38. The absence of a stipulation that petitioners' returns were prepared with intent to evade tax distinguishes <u>Allen</u> from the instant cases in a key respect. When Mr. Allen stipulated that his returns were fraudulent, the issue for decision shifted from

---

[11]The Court directed the parties to file before trial a memorandum of law as to whether the period of limitations remains open on the basis of the Court's holding in <u>Allen v. Commissioner</u>, 128 T.C. 37 (2007).

whether the returns were fraudulent (a factual determination) to whether section 6501(c) held open the period of limitations on assessment (a legal determination). The stipulated false or fraudulent returns became the direct evidence necessary to prove fraud by clear and convincing evidence. Petitioners have made no such concessions of fraud here. To the contrary, they profoundly challenge that allegation. Respondent is correct that <u>Allen</u> is relevant insofar as section 6501(c) tolls the statute of limitations for false or fraudulent returns, but that fraud must be clearly and convincingly proven.

## II. Parties' Arguments

The point of contention between the parties is whether any return at issue was falsely or fraudulently prepared. Petitioners assert that their returns were not false or fraudulent and that section 6501(c) is inapposite. To support their claim, petitioners maintain that deductions claimed on the returns in question were for ordinary and necessary expenses of their business as OCSD employees and that any deductions claimed later determined to be nondeductible were claimed in good faith. Implicit throughout petitioners' argument is that the returns at issue may have been negligently prepared but were not fraudulent. On the other hand, respondent relies on <u>Allen</u> to support his allegation that the return preparers prepared petitioners'

returns fraudulently and that the statute of limitations on assessment is tolled under section 6501(c).

III.    Whether Any of Petitioners' Returns Were Fraudulent

A.    Overview

Respondent, if he is to prevail, must prove by clear and convincing evidence that each return at issue was false or fraudulent. See secs. 6501(c), 7454(a); Rule 142(b). A mere preponderance of the evidence will not sustain a finding of fraud-- what is needed is clear and convincing evidence of fraud. Gano v. Commissioner, 19 B.T.A. 518, 532-533 (1930). Clear and convincing evidence is

> "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal." * * *

Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 516 (1990) (quoting Cross v. Ledford, 161 Ohio St. 469 (1954)); see also Hobson v. Eaton, 399 F.2d 781, 784 n.2 (6th Cir. 1968).

Fraud is the intentional commission of an act or acts for the specific purpose of evading tax believed to be due and owing. Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Fraud may not be imputed or presumed but must always be

established by independent evidence of fraudulent intent to evade tax. Id. at 699.

Negligence, either general or gross, is not synonymous with fraud because fraud

requires scienter. Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968),

aff'g T.C. Memo. 1966-81; Bruce Goldberg, Inc. v. Commissioner, T.C. Memo.

1989-582, 58 T.C.M. (CCH) 519, 530 (1989). Whereas negligence or gross

negligence bespeaks breach of duty of care, "[f]raud implies bad faith, intentional

wrong doing and a sinister motive." Davis v. Commissioner, 184 F.2d 86, 87 (10th

Cir. 1950), remanding a Memorandum Opinion of this Court. The existence of

fraud is a factual determination to be gleaned from the entire record. Gajewski v.

Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d

1383 (8th Cir. 1978).

A fraud determination for purposes of the section 6501(c) period of

limitations on assessment is the same as assessing a taxpayer's liability for the

section 6663 fraud penalty. Rhone-Poulenc Surfactants & Specialties, L.P. v.

Commissioner, 114 T.C. 533, 548 (2000). Thus, respondent must prove for each

return at issue that (1) an underpayment of tax exists, and (2) the return preparer

intended to evade taxes known to be owing by conduct intended to conceal,

mislead, or otherwise prevent the collection of tax. See Parks v. Commissioner, 94

T.C. 654, 660-661 (1990). We consider each element in turn.

B.    Underpayment of Tax

Each petitioner or couple concedes liability for respondent's determined deficiencies if we conclude that the period of limitations is open under section 6501(c). Petitioners argue that the mere fact that they stipulated respondent's deficiency determinations does not satisfy respondent's burden of proving an underpayment of tax for each year at issue. Specifically, petitioners rely on Parks v. Commissioner, 94 T.C. at 661, in which we cautioned against bootstrapping a finding of fraud upon a taxpayer's failure to prove the Commissioner's determinations erroneous. Petitioners cite Parks out of context.

In Parks we stated that "[w]here * * * respondent has prevailed on the issue of the existence of a deficiency by virtue of a taxpayer's failure to carry his burden of proof, respondent cannot rely on that failure to sustain his burden of proving fraud. We must be careful in such cases not to bootstrap a finding of fraud upon a taxpayer's failure to prove respondent's deficiency determinations erroneous." Id. at 660-661 (citations omitted). Petitioners' deficiencies do not result from a failure of proof but from the parties' stipulations that petitioners are liable for the deficiencies if the period of limitations is open under section 6501(c). These stipulations are binding on the parties by virtue of Rule 91(e) and prove by clear and convincing evidence that an underpayment of tax exists with respect to each

petitioner or couple and for each year at issue.  Cf. Gold Bar, Inc. v. Commissioner, T.C. Memo. 2000-211, 80 T.C.M. (CCH) 33, 35-36 (2000) (taxpayer's concession that it overstated business expense deductions and omitted income satisfied the underpayment prong of the fraud penalty).

    C.    Fraudulent Intent

    1.    Overview

Since fraudulent intent is rarely confirmable with direct evidence, courts have distilled fraudulent intent by viewing circumstantial evidence in the light of certain indicia of fraud.  Among the factors to be evaluated in determining whether a return preparer acted with fraudulent intent are:  (1) Understatements of tax; (2) inadequate books and records; (3) implausible or inconsistent explanations of behavior; (4) failure to cooperate with, or failure to provide access to records to, tax authorities; (5) making false entries or alterations; (6) keeping a double set of records; and (7) any other conduct the likely effect of which is to mislead or to conceal.  See Spies v. United States, 317 U.S. 492, 499 (1943) (criminal tax evasion); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986) (civil fraud penalty), aff'g T.C. Memo. 1984-601; Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984) (civil fraud penalty), aff'g T.C. Memo. 1982-603.  When balancing these factors, we look to evidence that is "so strong" that fraud is the most manifest

explanation.  Biggs v. Commissioner, 440 F.2d 1, 5 (6th Cir. 1971), aff'g T.C. Memo. 1968-240; see also Richardson v. Commissioner, 509 F.3d 736, 743-745 (6th Cir. 2007), aff'g T.C. Memo. 2006-69.

### 2.     Respondent's Theory of Fraud

Respondent submits that Mr. Kern or Mr. Redinger prepared petitioners' tax returns fraudulently by claiming fabricated itemized deductions and understating petitioners' income.  To carry his burden, respondent relies on the general practice of Messrs. Kern and Redinger to claim deductions on the basis of client responses to questions without supporting records.  Respondent infers from this course of conduct, as well as the trial testimony of Deputy Kyriakides and Deputy Summers and the proffered testimony of 150 fact witnesses, that each return at issue in these cases was prepared with the intent to evade tax.  Respondent persuasively argues that some law enforcement officers acted fraudulently, but the generalizations on which he relies to meet his burden are neither clear nor convincing evidence that petitioners' returns were fraudulent.  On the other hand, petitioners' testimony raises a suspicion of fraud in the cases of Deputy Eriksen, the Hardins, and the Kesselrings or presents an overt admission of fraud in the case of Deputy Aginaga.  We consider each petitioner or couple in turn.

### 3. Deputy Eriksen, the Hardins, and the Kesselrings

When taken as a whole, the testimony of Deputy Eriksen, the Hardins, and the Kesselrings undercuts respondent's theory that their returns were false or fraudulent. Preliminarily, we note that petitioners were not named in the criminal informations filed in the District Court, and they were not listed among the clients for whom Mr. Redinger prepared false or fraudulent returns. As far as the record is concerned, petitioners' returns were first implicated during CID's investigation, though CID never conclusively determined the returns to be false or fraudulent. Respondent's theory is further called into doubt given Mr. Kern's plea allocution in which he stated that of the 1,900 or so returns he prepared annually, between 30 and 40, or between 1.6% and 2.1%, were false or fraudulent. We also view respondent's theory with heightened skepticism in view of statements Mr. Kern made to the District Court that the IRS challenged legitimate deductions.

At the same time, the fact that Mr. Kern's and Mr. Redinger's application of Federal income taxation law was amiss cannot plausibly be denied. They enabled clients to claim deductions on the basis of responses to questions targeting alleged cash outlays but did not require records substantiating those expenses. Taxpayers must maintain records substantiating deductions claimed. See sec. 6001; sec. 1.6001-1(a), (e), Income Tax Regs. Messrs. Kern and Redinger wrongfully relied

on estimates to prepare many of their clients' tax returns.  Taxpayers are generally prohibited from estimating vehicle expenses and expenses covered by section 274(d).  Sanford v. Commissioner, 50 T.C. 823, 828 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969).  Messrs. Kern and Redinger claimed deductions for petitioners for uniform cleaning and mileage even though the county reimbursed such expenses.  Trade or business deductions are not allowed for reimbursable expenses.  Lucas v. Commissioner, 79 T.C. 1, 7 (1982); see also Coplon v. Commissioner, 277 F.2d 534, 535 (6th Cir. 1960), aff'g T.C. Memo. 1959-34.  Messrs. Kern and Redinger concluded that clients' expenses for weapons, ammunition, protective gear, cell phone, and clothing were deductible.  They did not analyze whether those expenses were nondeductible personal expenses, see sec. 262, or whether they were ordinary and necessary expenses related to deputy petitioners' trade or business as OCSD employees, see sec. 162(a).  We conclude that these methods connote negligence but are not clear and convincing evidence of fraud.

Deputies Eriksen, Hardin, and Kesselring testified to purchasing weapons, ammunition, protective equipment, flashlights, handcuffs, and cold weather gear.  They likewise testified to donating cash, clothing, and household items to various charitable organizations, including churches, the Salvation Army, Goodwill, the

USO, Ducks Unlimited, and Trout Unlimited, among others.[12] We found this testimony general, vague, and perhaps coordinated, yet respondent did not examine Deputy Eriksen, Hardin, or Kesselring to such a degree as to destroy his credibility. As to claimed deductions for weapons, ammunition, protective equipment, and professional subscriptions, respondent did not offer evidence that Deputies Eriksen, Hardin, and Kesselring did not purchase such items. Such an allegation might have been easily proven by, for example, introducing bank records, credit card statements, and/or gun records as to whether each deputy petitioner purchased the claimed items. See 18 U.S.C. sec. 923(g)(1)(A) (2012) (requiring firearms dealers to maintain records of firearms sales ). Respondent introduced no such evidence.

Respondent misplaces reliance on petitioners' inability to substantiate the expenses claimed on their returns to prove fraud.[13] The Court of Appeals for the

---

[12]Although we seriously question whether these charitable contributions were made, respondent did not clearly and convincingly sustain his burden of proof on this issue. If the contributions were never made, as respondent suggests, he could have met his burden by summoning records from the organizations to which the donations were allegedly made or by offering bank records showing a lack of conforming proof. See sec. 7602(a)(2). No such evidence was presented.

[13]Respondent asserts that petitioners ignored "trial subpoenas" issued before trial, which we understand to refer to subpoenas duces tecum directing petitioners to produce certain documentary evidence. Relying on Wichita Terminal Elevator Co.

(continued...)

Sixth Circuit, the court to which an appeal of these cases would most likely lie, has cautioned that "'Failure to contest an adjustment made in determining the deficiency is not proof of fraud. The Commissioner cannot sustain his burden of proof on a fraud issue by statements made in his notice of deficiency.'" Drieborg v. Commissioner, 225 F.2d 216, 218-219 (6th Cir. 1955) (quoting Joseph v. Commissioner, 32 B.T.A. 1192, 1204 (1935)), aff'g in part a Memorandum Opinion of this Court; see also Parks v. Commissioner, 94 T.C. at 660-661. We are careful to not condition a finding of fraud on petitioners' lack of substantiation because respondent bears the burden of producing affirmative evidence of fraud.

The criminal convictions of Messrs. Kern and Redinger, the implausibility and inconsistency of their testimony, and the testimony of Deputies Summers and Kyriakides each weigh in favor of fraud. But those general factors, absent a more direct link to petitioners, merely heighten our suspicion of fraud. A suspicion of fraud, no matter how strong, is insufficient to sustain a finding of fraud. See Drieborg v. Commissioner, 225 F.2d at 219-220; Katz v. Commissioner, 90 T.C.

---

[13](...continued)
v. Commissioner, 6 T.C. 1158 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947), respondent claims that petitioners' failure to produce such records gives rise to a presumption that those documents would be unfavorable to them. We decline to draw such an inference. The record does not include copies of the trial subpoenas and it does not specify the scope of documents requested.

1130, 1144 (1988); <u>Shaw v. Commissioner</u>, 27 T.C. 561, 569-570 (1956), <u>aff'd</u>, 252 F.2d 681 (6th Cir. 1958); <u>Rinehart v. Commissioner</u>, T.C. Memo. 1983-184, 45 T.C.M. (CCH) 1185, 1195 (1983).  Respondent has not proven by clear and convincing evidence that the returns of Deputy Eriksen, the Hardins, or the Kesselrings were prepared with the intent to evade tax.[14]  Accordingly, we hold that assessments of Deputy Eriksen's, the Hardins', and the Kesselrings' tax are time barred.  Given that holding, we need not and do not  address Deputy Eriksen's, the Hardins', or the Kesselrings' liability for the deficiencies and accuracy-related penalties.

### 4.    Deputy Aginaga

Respondent asserts, and we agree, that Deputy Aginaga testified honestly and credibly.  Her testimony, however, serves as the direct evidence that each of her returns for 1999 through 2002 was false and fraudulent.  Deputy Aginaga's trial testimony establishes that she "never" purchased a gun or ammunition during any year at issue and that she explained as much to Mr. Kern.  Deputy Aginaga's statements on brief are consistent on this point in that she stated that "she did not

---

[14]Our result in these cases would not change even if respondent was allowed to call each of the 150 witnesses whose testimony he proffered.  Circumstantial evidence of this nature, without a more direct link to the taxpayers' returns, is not necessarily sufficient to sustain a finding of fraud.

actually purchase a gun or ammunition during the years at issue." Yet each return claimed as an unreimbursed employee expense deduction amounts for weapons and ammunition. By Deputy Aginaga's admission, therefore, each of her returns at issue contained false or fraudulent deductions for a weapon and ammunition. We regard Deputy Aginaga's admissions as direct evidence of Mr. Kern's willingness to commit fraud with intent to evade tax as it relates to each of her returns.

When viewed against the other indicia of fraud exhibited by Mr. Kern, the preparer who prepared each of Deputy Aginaga's returns, we are convinced that each of Deputy Aginaga's returns at issue was false or fraudulent. To be sure, Mr. Kern prepared Deputy Aginaga's 1999 through 2002 Federal income tax returns and claimed deductions for weapon and ammunition thereon even though he was forewarned that such purchases had not been made. Such misconduct resulted in understatements of income tax on each of Deputy Aginaga's 1999 through 2002 Federal income tax returns. The entries were admittedly fictitious and obviously not able to be substantiated with supporting records. We infer from this course of conduct, as well as Deputy Aginaga's admissions, that Mr. Kern intended to evade taxes known to be owing from Deputy Aginaga by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. On the basis of the foregoing,

we conclude that respondent has clearly and convincingly proven that deductions for a weapon and ammunition for each year at issue were claimed with fraudulent intent.

Once respondent has produced sufficient evidence to establish that a portion of Deputy Aginaga's underpayment was attributable to fraud, and we conclude he has, section 6501(c)(1) holds open the periods of limitations for those years.  See Allen v. Commissioner, 128 T.C. at 42; Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. at 548.  In view of our holding that the period of limitations is open on account of the false or fraudulent nature of each of Deputy Aginaga's 1999 through 2002 Federal income tax returns, Deputy Aginaga concedes the deficiencies respondent determined for each of those years.  Accordingly, we hold that there are respective deficiencies in Deputy Aginaga's 1999 through 2002 Federal income taxes of $495, $675, $803, and $825.

IV.    Deputy Aginaga's Liability for Accuracy-Related Penalties

Respondent also contends that Deputy Aginaga is liable for accuracy-related penalties for each of the years 1999 through 2002 for negligence or disregard of rules or regulations, substantial understatements of income tax, or substantial valuation misstatements.  See sec. 6662(a) and (b)(1), (2), and (3).  Because only one accuracy-related penalty may be imposed with respect to any given portion of

an underpayment, <u>see</u> sec. 1.6662-2(c), Income Tax Regs., we construe respondent's position as stating alternate grounds for the accuracy-related penalties. Our query focuses on whether Deputy Aginaga acted with negligence or disregard of rules or regulations.

Pursuant to section 7491(c), respondent bears the burden of production with respect to Deputy Aginaga's liability for the section 6662(a) penalties. This means that respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Deputy Aginaga testified that she claimed deductions which she did not incur and filed her Federal income tax returns for each of the years at issue without reviewing them. Consequently, we conclude that respondent has met his burden of production for determining accuracy-related penalties due to negligence or disregard of rules or regulations.

For purposes of section 6662, the term "negligence" includes any failure to make a reasonable attempt to comply with the income tax provisions of the Code. Sec. 6662(c). Disregard of rules or regulations includes any careless, reckless, or intentional disregard of rules or regulations. <u>Id.</u> Deputy Aginaga admitted at trial that she did not review any of her 1999 through 2002 Federal income tax returns, and she admitted to signing those returns without reviewing them. She accepted

that expenses claimed for weapons and ammunition were false and incorrect. The record as a whole establishes that Deputy Aginaga filed each of her tax returns with reckless disregard for rules and regulations. The false deductions claimed on Deputy Aginaga's returns are as much attributable to her failure to review those returns as they are to Mr. Kern's fraudulent preparation of them. Accordingly, we conclude that the accuracy-related penalties apply absent a mitigating affirmative defense.

Deputy Aginaga claims on brief that the accuracy-related penalties do not apply because she meets the reasonable cause defense of section 6664(c)(1). We are not persuaded. As support for her position, Deputy Aginaga generally relies on section 1.6664-4, Income Tax Regs. (and the included examples). That section states as a general rule that the most important factor to be evaluated in deciding whether a taxpayer acted with reasonable cause and in good faith is the extent to which the taxpayer sought to assess his or her proper tax liability. Sec. 1.6662-4(b)(1), Income Tax Regs. Deputy Aginaga goes on to state that she "missed" the falsely claimed deductions for a weapon and ammunition "because she didn't not [sic] review her tax returns."

A taxpayer is charged with knowledge and awareness of and responsibility for the items reported on his or her Federal tax returns. Allen v. Commissioner, 128

T.C. at 41 (citing <u>Magill v. Commissioner</u>, 70 T.C. 465, 479-480 (1978), <u>aff'd,</u> 651 F.2d 1233 (6th Cir. 1981)).  Where an individual claims ignorance of an item leading to an understatement of tax, the taxpayer must prove (at a minimum) that he or she fulfilled a duty of inquiry with respect to whether the correct liability was reported on the return.  <u>Cf.</u> <u>Stevens v. Commissioner</u>, 872 F.2d 1499, 1505 (11th Cir. 1989) (duty of inquiry in innocent spouse cases), <u>aff'g</u> T.C. Memo. 1988-63.  Deputy Aginaga acknowledged on brief that she neglected her duty of inquiry by not reviewing her 1999 through 2002 Federal income tax returns.  We refuse to excuse such neglect on the grounds of reasonable cause.  Accordingly, we hold that Deputy Aginaga is liable for accuracy-related penalties under section 6662(a) of $99, $135, $161, and $165 for 1999 through 2002, respectively.

In reaching our decision, we have considered all arguments made, and to the extent that we have not specifically addressed them, we conclude they are moot, irrelevant, or without merit.

To give effect to the foregoing,

<u>Appropriate orders and decisions</u>

<u>will be entered</u>.